# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THOMAS BEALE,                          )
      Plaintiff                     )
                           )
vs.                                    )      **C.A.No. 13-15 ERIE**
                           )      **District Judge Rothstein**
MAXINE OVERTON, et al,                 )      **Magistrate Judge Baxter**
      Defendants.                   )

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

## I.      RECOMMENDATION

It is respectfully recommended that the motion for summary judgment by the Defendants (ECF No. 122) be granted in part and denied in part.

## II.      REPORT

Plaintiff Thomas Beale ("Plaintiff") is an inmate in the custody of the Pennsylvania Department of Corrections ("DOC"). ECF No. 142, Plaintiff's Response to Concise Statement, ¶ 1. Plaintiff was housed at the State Correctional Institution at Albion ("SCI-Albion") from May 1, 2011 through November 23, 2015, at which point he was transferred from SCI-Albion to the State Correctional Institution at Chester ("SCI-Chester"). Id. ¶¶ 2, 4. At all relevant times, the Superintendent at SCI-Albion was Michael Harlow ("Harlow"). Id. ¶ 8.

From May 1, 2011, through February 7, 2012, Plaintiff was housed on the B-Block at SCI-Albion. Id. ¶ 2. Michelle Wagner ("Wagner") was Plaintiff's Unit Manager while he was housed on B-Block. Id. ¶ 13. Sergeant Harold Hodge ("Hodge") served as the Housing

Sergeant.  Id. ¶¶ 20-21.  Corrections Officer Gary Ferraro ("Ferraro") was assigned to B-Block as a housing officer.  Id. ¶¶ 26-27.

On February 7, 2012, Plaintiff was transferred from B-Block to F-Block.  Id. ¶ 3.  While on F-Block, Plaintiff's Unit Manager was Brian Flinchbaugh ("Flinchbaugh").  Id.  Sergeant William Maloney ("Maloney") served as the Housing Sergeant on F-Block.  Id. ¶¶ 24-25.

Prior to 2008, smoking was both permitted and widespread throughout SCI-Albion.  Id. ¶ 68.  Sullivan and Ferraro each estimated that over half of the inmate population smoked.  Id. ¶¶ 221-222.  Maloney estimated that one quarter to one third of the population smoked, and Hodge stated that "quite a few" of the inmates (although less than half) were smokers.  Id. ¶¶ 223-224.  Dr. Robert Maxa, the Site Medical Director at SCI-Albion, opined that "the majority of inmates" smoked.  Id. ¶ 225.

Following the Pennsylvania General Assembly's passage of the Clean Indoor Air Act in 2008, the DOC implemented a new policy banning all indoor smoking at any DOC facility, including SCI-Albion.  Id. ¶ 70.  Thereafter, the only permissible place to smoke at SCI-Albion was in a designated outdoor location.  Id. ¶ 73.

Despite the DOC's designation of SCI-Albion as a smoke-free facility, indoor smoking remained common at the institution.   Tobacco products, including cigarettes, were available for purchase in the prison commissary and could be stored in the inmates' cells in large quantities.  Id. ¶¶ 226-27.  Ferraro testified that he would catch inmates smoking in their cells on a daily basis.  Id. ¶ 231.  Wagner, Pierce, Lindsey, Maloney and Hodge admitted that the inmates at SCI-Albion routinely smoked indoors, although they each testified that they would typically issue a verbal warning if they actually saw an inmate smoking.  Id. ¶¶ 232-236.  At least fifteen inmates who were incarcerated at SCI-Albion at the same time as Plaintiff have supplied

2

declarations stating that inmates routinely smoked in their cells and in other indoor locations within the prison during that time.  Id. ¶¶ 265-274.

When illicitly smoking indoors, inmates at SCI-Albion typically smoked in their cells rather than in common areas such as the prison block's dayroom.  Id. ¶ 77.  However, because prison cells at SCI-Albion were connected together in groups of four cells for purposes of heating and ventilation, smoke from one cell could penetrate into a neighboring cell by way of those vents.  Id. ¶¶ 241-243.  Ferraro testified that he could see "clouds of smoke like where somebody was creating a lot of cigarette smoke coming from a cell" while working on Plaintiff's prison block, and Hodge, Maloney, Sullivan, and Williamson each testified that environmental tobacco smoke ("ETS") could regularly be smelled on the floor of the unit.  Id. ¶¶ 248-541.

Several factors made enforcement of the smoking policy at SCI-Albion challenging.  Prison employees and officials testified that the policy was "difficult to enforce" because of the size of the inmate population, the relatively smaller number of staff, the physical layout of the cells, and the "clientele that you're working with in these facilities."  Id. ¶ 70, 76.  In addition, inmates generally attempted to hide or cover up their smoking if they thought they were going to get into trouble.  Id. ¶ 78.  For example, the fact that prison cells were grouped into blocks with shared ventilation made it difficult for corrections officers to determine the source of any cigarette smoke.  Id. ¶ 243.  Inmates could blow smoke from their cells into the ventilation system or under the doors of their cells so that it would exit and flow into other cells or common areas.  Id. ¶¶ 243-244.

The record contains conflicting evidence with respect to the degree to which enforcement of the smoking policy was prioritized by prison staff.  Wagner, Hodge, Maloney, Ferraro, and Sullivan each testified that they received verbal direction to enforce the non-smoking policy and

that they attempted to do so. <u>Id</u>. ¶ 75. Harlow testified that enforcement of the policy was "cut and dry" and that "[e]very effort was made that if somebody did smoke inside the buildings that they were dealt with appropriately with the procedures that were in place." <u>Id</u>. ¶ 91.

On the other hand, despite the fact that 2,300 inmates were housed at SCI-Albion, only 16 total misconducts were issued for violations of the smoking policy in 2011. <u>Id</u>. ¶ 281. In 2012, only six misconducts were issued. <u>Id</u>. ¶ 283. Sullivan explained that this was because the prison staff typically had "bigger fish to fry out there than writing somebody up for smoking." <u>Id</u>. ¶ 289. Although the smoking policy authorized the imposition of fines for smoking violations, no inmate at SCI-Albion was ever issued a fine for smoking during the pertinent time period. <u>Id</u>. ¶ 292. Instead, corrections officers would issue a verbal reprimand or warning or take no action at all. <u>Id</u>. ¶¶ 289, 293, 300-304.

When he arrived at SCI-Albion in 2011, Plaintiff's medical records indicated that he was allergic to cigarette smoke. <u>Id</u>. ¶ 311, 321. A physical examination performed shortly after his transfer suggested that he was allergic to cigarette smoke but was "normal" with respect to asthmatic symptoms. <u>Id</u>. ¶ 322. Almost immediately, however, Plaintiff began to complain about exposure to ETS at SCI-Albion. <u>Id</u>. ¶ 101. He frequently reported to the prison medical department with complaints of shortness of breath, wheezing, coughing, and other asthmatic symptoms. <u>Id</u>. ¶¶ 100-102, 314.

Plaintiff also began to experience occasional incidents of syncope, meaning that he would pass out and be found unconscious. On May 28, 2011, for example, Plaintiff was found unresponsive in the dayroom of his unit and did not revive until approximately fifteen minutes later. <u>Id</u>. ¶ 330. Similar incidents occurred on July 6, 2011, October 9, 2011, October 18, 2011, January 5, 2012, and February 9, 2012. <u>Id</u>. ¶¶ 330-331, 334, 336, 338-339. After the incident on

October 9, 2011, a visiting physician examined Plaintiff and diagnosed Plaintiff's most recent syncope episode as having been potentially caused by an allergic reaction to ETS. Id. ¶ 335.

In February 2012, Plaintiff was diagnosed with asthma. Id. ¶ 319. After this, Plaintiff continued to report to the SCI-Albion prison medical center with reports of symptoms such as painful coughing, chest pain, allergic reactions, rashes, green phlegm, sinusitis, and blood-tinged sputum. Id. ¶¶ 332-334, 337, 340, 342-343, 345-46, 349.

Throughout his time at SCI-Albion, Plaintiff repeatedly complained about the persistence of ETS in the prison. Harlow spoke with Plaintiff about the issue on multiple occasions and acknowledged that Plaintiff had repeatedly informed him of his allergies and his need to avoid exposure to ETS. Id. ¶¶ 357-359, 361. In addition to verbally complaining about ETS, Plaintiff wrote several letters to Wagner and Harlow informing them of his allergies and his struggles with ETS exposure. Id. ¶ 373-375. Plaintiff also submitted at least two grievances through the prison grievance system concerning his allegations of excessive ETS exposure and the lack of the enforcement of the prison's anti-smoking policy. Id. ¶¶ 359, 364.

Shortly after he began filing his grievances, a number of incidents took place which Plaintiff contends were retaliatory. On December 23, 2011, Lindsey and Sullivan performed a "random" search of Plaintiff's cell. Id. ¶ 463. Although a random cell search typically targets both of the inmates housed in a cell, Plaintiff contends that Lindsey and Sullivan only searched his own property and possessions on this occasion. Id. ¶ 472. Lindsey and Sullivan confiscated Plaintiff's footlocker and a pair of broken Koss headphones. Id. ¶¶ 473, 482-483. Sullivan later issued a written misconduct to Plaintiff related to the headphones. Id. ¶ 484. Although the headphones were technically contraband, the record suggests that it was uncommon for such items to be confiscated or for their possession to result in a misconduct. Id. ¶ 482, 489-90.

On December 28, 2011, Wagner called Plaintiff into her office and informed him that she was taking away his job in the prison commissary because of the misconduct he had received for possessing the broken headphones.  Id. ¶ 490.  Prison regulations specify that a prisoner's job cannot be taken away for misconduct unless the misconduct is "work-related."  Id. ¶¶ 491-492.  Although Plaintiff's cell search was not connected to his job in the commissary, Wagner sanctioned Plaintiff as if he had sustained a "work-related" misconduct.  Id. ¶ 495, 497-499.  Plaintiff appealed the decision to Harlow who granted his appeal and reversed Wagner's decision to remove him from his job at the commissary.  Id. ¶ 513.

On February 9, 2012, Plaintiff collapsed in the prison dayroom and dropped some legal papers on the floor related to a potential lawsuit against the prison.  Id. ¶ 519.  Maloney seized the papers and delivered them to the prison security office.  Id. ¶ 519.  Within two weeks of this event (and during the same timeframe that Plaintiff was submitting his formal grievances concerning ETS), Plaintiff's cell was subjected to two "investigative" searches by Williamson and Pierce, at least one of which he was not present for.  Id. ¶ 520, 530.  Plaintiff was informed that his cell had been searched because the security office "had reasonable suspicion that serious contraband was present in that cell," but neither Williamson nor Pierce could recall what that suspicion was based on or what the suspected contraband was.  Id. ¶ 524.  The officers confiscated Plaintiff's television, some electronics, and a number of legal documents that Plaintiff had compiled in anticipation of filing the instant lawsuit.  Id. ¶ 534.  Several of his personal possessions were destroyed or damaged.  Id. ¶¶ 530-531.

Plaintiff, acting *pro se*[1], initiated this civil rights action pursuant to 42 U.S.C. § 1983 by filing a motion to proceed *in forma pauperis* on January 14, 2013, accompanied by a motion for

---

[1] At this stage of the litigation, Plaintiff is represented by counsel.

preliminary injunction.[2]  ECF Nos. 1-4.  Plaintiff's Complaint was docketed on July 15, 2013.

ECF No. 16.  An Amended Complaint was filed on June 23, 2014.  ECF No. 64.

In his Amended Complaint, Plaintiff named a host of state and SCI-Albion prison

officials and employees as Defendants in this action.  On February 12, 2015, the undersigned

issued a Report and Recommendation that Plaintiff had stated an Eighth Amendment claim

against Harlow, Hodge, Corrections Officer Fontella Jones ("Jones"),[3] Ferraro, Maloney and

Wagner.  The undersigned also recommended that Plaintiff had stated a First Amendment

Retaliation claim against Sullivan, Lindsey, Williamson, Pierce, and Wagner.  ECF No. 79.  It

was further recommended that Plaintiff's claims against all other Defendants be dismissed with

prejudice.  Id.  The Report and Recommendation was adopted in full by Order dated May 21,

2015.  ECF No. 84.

On September 2, 2016, the remaining Defendants filed a motion for summary judgment.

ECF No. 122.  Plaintiff filed a Response in Opposition on November 11, 2016.  ECF No. 141.

This matter is now ripe for review.

### A.  Standard of Review

Federal Rule of Civil Procedure 56(c)(2)  provides that summary judgment shall be

granted if the "pleadings, the discovery and disclosure materials on file, and any affidavits show

that there is no genuine issue as to any material fact and that the movant is entitled to judgment

---

[2] A hearing was held on the motion for injunctive relief on July 23, 2013, at which Plaintiff's
motion for preliminary injunction was denied as moot.  See ECF Minute Entry 7/23/13; ECF No.
31.

[3] Although the parties neglected to specifically identify "Jones" in their concise statements of
material fact, it appears that Fontella Jones was a corrections officer who frequently worked with
Maloney on F-Block.  See ECF No. 142 ¶¶ 297, 413, 416-17.

as a matter of law." Rule 56(e)(2) further provides that when a motion for summary judgment is made and supported, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."

A district court may grant summary judgment for the defendant when the plaintiff has failed to present any genuine issues of material fact. Fed.R.Civ.P. 56(c). The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007); UPMC Health System v. Metropolitan Life Ins. Co., 391 F.3d 497, 502 (3d Cir. 2004).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Fed.R.Civ.P. 56(e); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989)(the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322. See also Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). The non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." Garcia v. Kimmell, 2010 WL 2089639, at * 1 (3d Cir. 2010) quoting Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005).

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  See also El v. SEPTA, 479 F.3d 232, 238 (3d Cir. 2007).

A material fact is a fact whose resolution will affect the outcome of the case under applicable law.  Anderson, 477 U.S. at 248.  Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Id. at 247-249.

"Where the party opposing a motion for summary judgment bears the ultimate burden of proof, the moving party may discharge its initial burden of showing that there is no genuine issue of material fact 'by showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'"  Player v. Motiva Enterprises, LLC, 240 Fed.Appx 513, 522 n4 (3d Cir. 2007) quoting UPMC Health Sys. v. Metro. Life Ins. Co., 391 F.3d 497, 502 (3d Cir. 2004).  If the moving party has satisfied its initial burden, the nonmoving party must, in their opposition to the motion, identify evidence of record that creates a genuine issue of material fact.  Childers v. Joseph, 842 F.2d 689, 694-95 (3d Cir. 1988).

**B.  Analysis**

Plaintiff contends that he suffers from several medical conditions that either stem from or are exacerbated by exposure to ETS, including asthma and allergies.  Despite these medical

conditions, Plaintiff contends that staff at SCI-Albion refused to enforce the prison's non-smoking policy and disregarded his frequent requests to be housed away from inmates who smoked. Plaintiff also contends that he suffered retaliation after he filed grievances complaining of incidents where he was exposed to ETS or suffered negative health effects as a result of exposure to ETS. Each of his claims will be addressed in turn.

## 1. Eighth Amendment – Exposure to ETS

In order to succeed on an Eighth Amendment claim based on exposure to ETS, Plaintiff must establish that: (1) he has been exposed to unreasonably high levels of ETS contrary to contemporary standards of decency; and (2) that prison authorities were deliberately indifferent to his exposure to ETS. Brown v. U.S. Justice Dep't, 271 F. App'x 142, 144 (3d Cir. 2008) (citing Helling v. McKinney, 509 U.S. 25, 35 (1993)). As explained by the Court of Appeals for the Third Circuit:

> [T]he first prong of the Helling test is an objective one: '[The prisoner] must show that he himself is being exposed to unreasonably high levels of ETS.' [Helling], 509 U.S. at 35. With respect to the objective factor . . . the Eighth Amendment requires 'a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwilling to take such a risk.' Id. at 36 (emphasis in original). The Court stated: 'In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.' Id.
>
> The second prong of the Helling test is a subjective one: whether prison officials were deliberately indifferent to a serious risk of harm. Id. at 36. The Supreme Court has held that 'a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which an inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

<u>Atkinson v. Taylor</u>, 316 F.3d 257, 262 (3d Cir. 2003).

With respect to the objective prong, courts have traditionally distinguished between situations presenting occasional and sporadic exposure to ETS and those involving constant immersion in unwanted cigarette smoke. In <u>Helling</u>, for example, the United States Supreme Court determined that being forced to bunk with a cellmate who smoked five packs of cigarettes a day exposed the plaintiff to an unreasonable risk of harm from ETS exposure. <u>Helling</u>, 509 U.S. at 35. In <u>Atkinson</u>, the Third Circuit held that a prisoner had stated an Eighth Amendment claim after alleging that he had been forced to share a cell with "constant" smokers for many months. <u>Atkinson</u>, 316 F.3d at 259.

In <u>Mearin v. Swartz</u>, on the other hand, the district court rejected an ETS-exposure claim brought by two inmates because "the amount of time that [they] spent with smoking cellmates was short, their complaints are relatively minor and are not linked to ETS exposure and the Defendants have presented evidence that the ventilation system make it unlikely that they were exposed to any significant level of ETS." <u>Mearin</u>, 2014 WL 1922786, at *16 (W.D. Pa. May 14, 2014). Other courts have reached the same conclusion where the plaintiff's allegations were vague and unsubstantiated or suggested only occasional ETS exposure. <u>See</u>, <u>e.g.</u>, <u>Brown</u>, 271 F. App'x at 144 ("[D]espite Brown's general claims, he did not specify how he was exposed to levels of ETS that pose an unreasonable risk of damage to his future health."); <u>Richarson v. Spurlock</u>, 260 F.3d 495, 498 (5th Cir. 2001) ("[S]poradic and fleeting exposure" to ETS does not constitute an "unreasonably high level[]" even if it is "unwelcome and unpleasant"); <u>Belland v. Matachiski</u>, 2009 WL 1585811, at *5–6 (M.D. Pa. June 3, 2009) (inmate with asthma failed to show that he was injured by ETS or that he was exposed to it at a level that society is unwilling to accept).

Defendants characterize Plaintiff's allegations of ETS exposure as a series of "isolated" incidents, noting that he was never housed with a smoker for a prolonged period of time or exposed to ETS in the dining hall or his work site. ECF No. 123 at 12. However, a careful review of the record reveals ample evidence from which a reasonable jury could infer that Plaintiff had been exposed to unreasonably high levels of ETS. As an initial matter, Plaintiff has supplied detailed information from his own journal, supported by a sworn declaration, chronicling dozens of incidents where he was exposed to excessive ETS (often several times within the same day) while in his housing unit. ECF No. 142 ¶¶ 391-437. For example, on November 5, 2011, Plaintiff documented that the entire housing unit smelled of ETS and that an inmate in a neighboring cell was steadily smoking throughout the day. Id. ¶ 393. Plaintiff was exposed to ETS approximately seven times that day, with each exposure causing Plaintiff to experience symptoms such as "uncontrollable coughing with sputum, shortness of breath, wheezing, dizziness, side pains, chest pains, severe headache, burning and dry eyes, and itching." Id. ¶ 393. Similar incidents occurred on a frequent, recurring basis between October 2011 and May 2012. ECF No. 142 ¶¶ 391-437.

Additionally, at least fifteen of Plaintiff's fellow inmates have submitted declarations stating that indoor smoking was a common, daily occurrence at SCI-Albion. Four inmates who were housed with Plaintiff on B or F Block during the relevant time period admitted that they (and many other inmates) routinely smoked indoors despite being aware of other inmates' complaints about ETS. Id. ¶¶ 265-266, 273. Several other inmates who were not smokers submitted declarations stating that other inmates routinely smoked in their cells. Id. ¶¶ 267-71, 273. Inmate Robert Williams averred that "cigarette smoke could be smelled almost constantly from the day room outside the cells" during the time in which he was housed with Plaintiff at

SCI-Albion and that "inmates smoked inside their cells on the housing unit on a daily basis."

ECF No. 143-2 ¶¶ 7-8.  These declarations suggest that Plaintiff's exposure to ETS was

pervasive and persistent.  See, e.g., Wilson v. Burks, 423 F. App'x 169, 173-74 (3d Cir. 2011)

(relying on affidavits from the plaintiff's former and current cell-mates to conclude that

plaintiff's "exposure to ETS was a pervasive, everyday affair.").

Testimony from several of the Defendants corroborates that indoor smoking on the

housing unit was a "daily" occurrence.  Id. ¶ 231.  Ferraro testified that he would catch inmates

smoking in their cells "one or two" times a day and that he would occasionally "see clouds of

smoke like where somebody was creating a lot of cigarette smoke coming from a cell" while on

Plaintiff's cell block unit.  ECF No. 125-7 at 69-70, 123-24.  Wagner admitted that ETS created

by inmates smoking in their cells would drift out to the entire unit and that it "wasn't

uncommon" to smell smoke in the unit.  ECF No. 125-4 at 63, 65.  Hodge conceded that he

could smell smoke on the unit block when he was doing his rounds past the inmates' cells.  ECF

No. 142 ¶ 249.  Maloney testified that he could smell ETS while in the dayroom of the F Unit at

least once or twice per week.  Id. ¶ 250.   Sullivan admitted that inmates smoked indoors and that

ETS could be seen "lingering around" their cells and in common areas of the unit block.  Id. ¶

251.

Finally, as noted by Plaintiff, the Eighth Amendment standard for excessive ETS

exposure is based on "contemporary standards of decency."  Helling, 509 U.S. at 35.  In other

words, the Eighth Amendment "draw[s] its meaning from the evolving standards of decency that

mark the progress of a maturing society."  Atkins v. Virginia, 536 U.S. 304, 311-12 (2002)

(quoting Trop v. Dulles, 356 U.S. 86, 100-101 (1958)).  The Pennsylvania General Assembly's

decision to legislatively ban smoking from all government buildings, including its prisons,

reflects an increased awareness of the dangers of ETS and the level of exposure that "today's society chooses to tolerate." Helling, 509 U.S. at 33. See also Murrell v. Casterline, 307 F. App'x 778, 779 (5th Cir. 2008) ("With regard to Helling's objective prong, . . . a June 2006 Surgeon General's report . . . concluded that there is no safe level of exposure to secondhand smoke . . ."); Gipson v. Keith, 2015 WL 5772003, at * 7 (W.D. La. July 23, 2015) (noting that the passage of an indoor smoke-free air act is "evidence of society's increasing intolerance to ETS"). In conjunction with the evidence discussed above, Pennsylvania's legislative recognition of the hazards of ETS supports the inference that a reasonable contemporary jury could find that the level of secondhand smoke at SCI-Albion was excessive.

Defendants next maintain that, even if Plaintiff can establish exposure to excessive amounts of ETS, he has still failed to connect that exposure to any "serious" injuries. In Mearin, the court observed that "claims brought by prisoners who allege injuries such as eye irritation, nausea, headaches and breathing problems but fail to link these symptoms to ETS exposure" are routinely dismissed. Mearin, 2014 WL 1922786, at *11 (collecting cases). Here, however, Plaintiff has submitted medical records indicating that he is allergic to cigarette smoke and suffers from asthma and other breathing difficulties. ECF No. 142 ¶¶ 311, 321. There is also evidence to suggest that these symptoms arose or became more severe during his time at SCI-Albion. Id. ¶¶ 312-349. Finally, the record indicates that Plaintiff may have occasionally experienced severe reactions, including syncope, as a direct or indirect result of his exposure to ETS. ECF No. 142 ¶ 335. Although Defendants dispute the link between Plaintiff's syncope and his exposure to ETS, resolution of this material factual dispute is the province of a jury.

In short, there is ample evidence in the record from which a reasonable jury might infer that Plaintiff was exposed to excessive amounts of ETS on a frequent or near-daily basis and that

he suffered serious medical consequences as a result. This evidence is sufficient to survive summary judgment with respect to the objective prong of the Helling analysis.

Turning to the second element of his Eighth Amendment claim, Plaintiff must allege sufficient facts to demonstrate "personal involvement" in the alleged violation by one or more of the remaining Defendants. Personal involvement in the alleged wrongdoing may be shown "through allegations of personal direction or of actual knowledge and acquiescence." Evancho, 423 F.3d at 353 (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)). Put simply, Plaintiff must demonstrate that a defendant "had actual knowledge of the serious conditions of Plaintiff's need to [avoid cigarette smoke]," "knew that these conditions . . . had been going on for a significant period of time," and "refused to rectify the conditions." Mearin, 951 F.Supp.2d at 784.

As an initial matter, the evidence presented supports the claim that Plaintiff's allergy to cigarette smoke was well-known to the staff at SCI-Albion. Wagner admitted that she was aware of Plaintiff's medical issues and his frequent complaints stemming from exposure to ETS. ECF No. 142 ¶ 350, 374-378. Maloney acknowledged that the prison's staff had informed him that Plaintiff was sensitive to cigarette smoke that that "he can't be around it." Id. ¶ 352. Harlow admitted that Plaintiff frequently complained to him directly about his allergies, his exposure to ETS, and his concerns about non-enforcement of the no-smoking policy. Id. ¶¶ 357-364. Plaintiff complained to Hodge about exposure to ETS on at least eight documented occasions between October 5, 2011 and February 3, 2012. Id. ¶¶ 391-400. He complained to Ferraro on at least nine documented occasions during that same timeframe. Id. ¶¶ 401-410. On these and many other occasions, Plaintiff experienced some combination of symptoms – typically,

coughing, shortness of breath, headaches, burning eyes, side and chest pains, nausea, and hives with itching – in the presence of either Hodge, Ferraro, Maloney or Jones. Id. ¶¶ 391-437.

Despite these incidents, there is ample evidence to suggest that the Defendants failed to take any serious steps to ensure that the prison's non-smoking policy was enforced. Plaintiff's notes indicate that corrections officers were present for most of these incidents but made no effort to determine where the ETS was coming from. Id. ¶¶ 391-437. Sullivan explained that the prison staff had "bigger fish to fry" than catching smokers and admitted that he felt that inmates should be allowed to smoke in their cells if they wanted to. Id. ¶ 289; ECF No. 125-8 at 118. Despite being authorized to issue fines to inmates caught smoking, Defendants testified that they generally limited their enforcement of the smoking policy to verbal warnings and comments. ECF No. 142 ¶¶ 289, 292-293, 300-304. Finally, despite the fact that 2,300 inmates were housed at SCI-Albion, only 22 total misconducts were issued for violations of the smoking policy in 2011 and 2012. As noted by the Third Circuit, these statistics "raise a factual issue as to whether the small number of disciplinary citations issued for violations of the non-smoking policy meant that exposure to second-hand smoke was occasional . . . or whether the smoking ban was just poorly enforced." Wilson, 423 F. App'x at 174.

On balance, a reasonable jury could conclude that Defendants Harlow, Wagner, Hodge, Maloney, Jones and Ferraro each had actual knowledge of the harm caused by Plaintiff's exposure to ETS but failed to take action to enforce the prison's ETS policy. See Mearin, 951 F.Supp.2d at 784. For these reasons, it is recommended that Defendants' motion for summary judgment as to Plaintiff's Eighth Amendment claim be denied.

## 2. First Amendment Retaliation

Plaintiff next contends that Defendants Wagner, Sullivan, Lindsey, Pierce and Williamson responded to his formal complaints about ETS at SCI-Albion by engaging in retaliatory acts designed to punish him for his complaints and dissuade him from further protected activity. Specifically, Plaintiff contends that Sullivan and Lindsey conducted a targeted search of his cell (under the guise of a "random" search) during which they broke his foot locker and improperly confiscated a set of broken headphones that he was hoping to fix. Shortly thereafter, Wagner terminated Plaintiff from his job in the prison commissary based on his possession of the headphones, despite that termination was not an appropriate sanction for non-work related misconduct. A few days later, Williamson and Pierce performed another invasive search of Plaintiff's cell that resulted in the confiscation of his television, typewriter, antenna, and legal papers, as well as the destruction of some of his personal effects (including his television).

To prevail on any of these claims, Plaintiff must demonstrate: (1) that he engaged in constitutionally protected conduct; (2) that an adverse action was taken against him by a prison official; and (3) that there is a causal connection between the exercise of his constitutional rights and the adverse action. Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003).

The first two elements of Plaintiff's retaliation claim are easily satisfied. There is no question that "[t]he filing of grievances is constitutionally protected activity that satisfies the first prong of the *prima facie* case of retaliation." Marten v. Hunt, 2009 WL 1858257, at * 5 (W.D. Pa. June 29, 2009) (citing Robinson v. Taylor, 204 F. App'x 155, 157 (3d Cir. 2006)). Cell searches, confiscation of property, and termination from a prison job are examples of activity that can satisfy the adverse action prong. Marten, 2009 WL 1858257, at *7 ("Cell searches and the resulting confiscation of property (if motivated solely by retaliatory motive) satisfy the

adverse action prong.") (citing <u>Medina v. City of Philadelphia</u>, 2004 WL 1126007, at * 7 (E.D. Pa. May 19, 2004) ("Certainly, confiscation [of personal property] could deter a prisoner from exercising his constitutional right to petitioner the court to redress future grievances."));

<u>Kantamanto v. King</u>, 651 F.Supp.2d 313, 326 (E.D. Pa. 2009) (holding that termination from a prison position "satisfies the 'adverse action' requirement . . . as it would be 'sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights.") (quoting <u>Rauser</u>, 241 F.3d at 333).  Defendants do not dispute either of these elements.

In order to prevail, however, Plaintiff must also produce evidence establishing a "causal connection between the exercise of the constitutional rights and the adverse actions."  <u>Marten</u>, 2009 WL 1858257, at *7.  A causal link is established when the "constitutionally protected conduct was a substantial or motivating factor in the decision to discipline [the prisoner]." <u>Carter v. McGrady</u>, 292 F.3d 152, 158 (3d Cir.2002) (citing <u>Rauser v. Horn</u>, 241 F.3d 330, 333 (3d Cir. 2001)).  "At the summary judgment stage, the plaintiff need only meet his burden of producing evidence from which a reasonable jury could conclude that the adverse action was taken in retaliation for the exercise of his protected rights."  <u>Booth v. King</u>, 346 F.Supp.2d 751, 762 (E.D. Pa. 2004).   The Third Circuit has recently reiterated that an inmate can satisfy this burden "with evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action or (2) a pattern of antagonism coupled with timing that suggests a causal link."  <u>Watson v. Rozum</u>, 834 F.3d 417, 422 (3d Cir. 2016).

With respect to his allegations against Wagner, Plaintiff primarily contends that she terminated him from his position in the prison commissary in retaliation for filing grievances and lodging complaints related to ETS exposure.  He also suggests that Wagner may have directed or ordered the invasive cell searches carried out by Sullivan, Lindsey, Williamson, and Pierce.

As an initial matter, the timing of Wagner's actions are not sufficient, on their own, to establish causation. Plaintiff filed his first grievance related to ETS on August 31, 2011. ECF No. 142 ¶ 359. Wagner acknowledged that, while she did not specifically recall seeing that grievance, she would typically be notified of grievances filed by inmates in her housing unit and believes she would have seen that one. Id. ¶ 384. When his grievance did not result in any action to curb the amount of smoking in his housing unit, Plaintiff submitted an Inmate Request to Wagner's superior officer, Major Gilmore, on December 7, 2011. Id. ¶ 386. Wagner acknowledged that Major Gilmore spoke to her about Plaintiff's complaints a few days later. Id. Plaintiff's termination occurred a few weeks thereafter, on December 28, 2011. Id. ¶ 490. Courts have consistently held that a temporal span of two or three weeks is not unusual enough to suggest causation on its own, but might suffice to establish causation in connection with other evidence of retaliatory animus. See, e.g., Escanio v. United Parcel Serv., 538 F. App'x 195, 200 (3d Cir. 2013) (finding that period of roughly three weeks between protected activity and termination, without more, is not unduly suggestive of retaliatory motive); Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003) (finding that three week period between protected activity and termination was insufficient, without other evidence, to establish required causal link).

In the instant case, Wagner acknowledged that she was generally aware of Plaintiff's frequent complaints (both formal and informal) about his exposure to ETS in the prison. ECF No. 125-4 at 127-31. Indeed, she admitted that she viewed Plaintiff as a "difficult" inmate who was "never happy" and "always seemed to have a complaint." Id. at 125-28. A reasonable jury could infer that Wagner simply did not like Plaintiff because of his constant complaints about ETS.

Nonetheless, the record also reflects that Wagner may have exceeded her authority in terminating Plaintiff from his job on the basis of non-work related misconduct. As noted above, DOC regulations specify that a work-related sanction may only be imposed for work-related misconduct. ECF No. 142 ¶¶ 491-492. Consequently, Wagner only had authority to issue that particular sanction if Plaintiff's misconduct stemmed from something related to his job. Id. ¶ 504. Wagner explained that she recalled having a discussion with an unidentified member of the search team who informed her that the headphones "may have come from him working in the commissary, and there was an association." ECF No. 125-4 at 165. However, she could not identify the officer who provided that information and admitted that no other explanation was provided prior to her decision to issue the sanction. Id. at 167-68. In contrast, Maloney, Sullivan, and Lindsey each testified that the search of Plaintiff's cell that recovered the headphones was not work-related, and Harlow conceded that there was no documentation to support a work-related sanction based on that cell search. ECF No. 142 ¶¶ 497-99, 501. If a jury were to resolve this disputed issue in Plaintiff's favor, it might reasonably infer that Wagner's decision to sanction Plaintiff in violation of DOC policy stemmed from retaliatory animus. See Jacobs v. Pa. Dept. of Corrections, 2009 WL 3055324, at *10 (W.D. Pa. Sept. 21, 2009) (holding that defendant's violation of DOC policy gave rise to an inference that the plaintiff's protected activity was the motivating factor behind the improper action).

Finally, there is evidence to suggest that Plaintiff was singled out for more severe punishment than other inmates who did not complain so frequently and vocally. First, there are disputed facts as to whether the December 23, 2011 search of Plaintiff's cell was truly random. When performing random cell searches, the search team at SCI-Albion typically focuses on a single cell block on any particular day, rather than shifting around the prison. ECF No. 142 ¶

462.  On the day of Plaintiff's cell search, however, the search team searched several cells on a different cell block before redirecting their search to Plaintiff's cell.  Id. ¶ 463.  In another break from the standard procedure, the search team focused its attention entirely on Plaintiff's possessions and property, ignoring those of his cellmate.  Id. ¶ 472.  As the Unit Manager, Wagner would have had the ability to provide input into the cells that she wanted "randomly" searched on any particular day.  Id.  ¶¶ 459-60.  Indeed, Plaintiff avers that Wagner was present in the housing unit and "giving a thumbs up sign and laughing" during the search of his cell that recovered the broken headphones.  Id. ¶ 460.

It was also unusual for a minor infraction (such as possession of broken electronics) to result in a charge of misconduct.  Plaintiff concedes that a broken pair of headphones is technically considered contraband because inmates are not permitted to possess broken electronics.  However, search team members have discretion as to whether or not to confiscate such items.  Id. ¶ 474.  Lindsey acknowledged that such items are not usually confiscated if it appears that the inmate is trying to fix them to get them to work again, and the record reflects that several other inmates possessed broken headphones that were not confiscated following cell searches.  Id. ¶¶ 474, 479-80.  Moreover, neither Plaintiff nor his cellmate could recall any other inmate having received a misconduct or punishment for possessing broken headphones.  Id. ¶ 482.  Framed against this background, a reasonable jury could conclude that the decision to single out Plaintiff for a written misconduct on the basis of a minor infraction was retaliatory in nature.

In short, there is sufficient evidence from which a reasonable jury might conclude that Wagner's termination of Plaintiff was motivated by retaliatory animus rather than legitimate

penological concerns. It is recommended that Wagner's motion for summary judgment as to Plaintiff's retaliation claim be denied.

We reach the opposite conclusion, however, with respect to the four corrections officers who performed the cell searches. It is axiomatic that a plaintiff "cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted." <u>Daniels v. Sch. Dist. of Phila</u>., 776 F.3d 181, 196-97 (3d Cir. 2015). There is no evidence in the record to suggest that Sullivan, Lindsey, Williamson or Pierce had any knowledge of Plaintiff's protected activity prior to his cell searches. Sullivan had never met or heard of Plaintiff prior to the December 23, 2011 cell search and was not aware of any grievances or complaints that Plaintiff had lodged based on ETS (or anything else). ECF No. 125-8 at 44, 46-47. Lindsey didn't know who Plaintiff was, was not aware of Plaintiff's complaints or grievances, and had no contact with Plaintiff outside of that single cell search. ECF No. 125-9 at 17-20. Williamson was generally aware of Plaintiff from having searched his cell on prior occasions, but had no idea whether Plaintiff had ever engaged in protected conduct or complained about ETS. ECF No. 125-10 at 39-40. Pierce had never heard of Plaintiff and could not remember ever having seen him prior to this lawsuit. ECF No. 125-11 at 10. Each Defendant explained that they were not typically informed of inmate grievances unless they were named in the grievance or assigned to investigate the grievance. ECF No. 142 ¶¶ 186-87, 214-15. Finally, Plaintiff conceded that he was not aware of any evidence that might impeach Sullivan, Lindsey, Williamson and Pierce's undisputed testimony that they were not aware of his protected activity at the time that the cell searches took place. ECF No. 125-12 at 71, 76. For each of these reasons, Plaintiff has failed to establish a causal connection between his complaints about ETS and any improprieties that occurred during the

subsequent cell searches. See, e.g., Daniels, 776 F.3d at 196-97; Tinio v. St. Joseph Medical Ctr., 645 F. App'x 173, 177 (3d Cir. 2016) (finding no causal connection where plaintiff failed to produce any evidence that defendant was actually aware of the protected activity).

For these reasons, it is recommended that Defendants' motion for summary judgment be granted as to Sullivan, Lindsey, Williamson and Pierce.

## III.    CONCLUSION

For the reasons stated herein, it is respectfully recommended that the Defendants' motion for summary judgment (ECF No. 122) be granted in part and denied in part, as follows:

It is recommended that Defendants' motion for summary judgment on Plaintiff's Eighth Amendment claim based on exposure to ETS be denied with respect to Defendants Harlow, Hodge, Jones, Ferraro, Maloney, and Wagner.

It is further recommended that Defendants' motion for summary judgment on Plaintiff's First Amendment retaliation claim be denied with respect to Wagner and granted as to Defendants Sullivan, Lindsey, Williamson, and Pierce.

The Clerk of Courts should be directed to terminate Defendants Sullivan, Lindsey, Williamson, and Pierce.

In accordance with 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72, the parties must seek review by the district court by filing Objections to the Report and Recommendation within fourteen (14) days of the filing of this Report and Recommendation. Any party opposing the objections shall have fourteen (14) days from the date of service of Objections to respond thereto. See Fed.R.Civ.P. 72(b)(2). Failure to file timely objections may constitute a waiver of

appellate rights.  See Brightwell v. Lehman, 637 F.3d 187, 194 n.7 (3d Cir. 2011); Nara v. Frank, 488 F.3d 187 (3d Cir. 2007).

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge

Dated: July 28, 2017